*326 Justice Breyer
delivered the opinion of the Court.
Federal Motor Vehicle Safety Standard 208 (1989 version) requires, among other things, that auto manufacturers install seatbelts on the rear seats of passenger vehicles. They must install lap-and-shoulder belts on seats next to a vehicle's doors or frames. But they have a choice about what to install on rear inner seats (say, middle seats or those next to a minivan’s aisle). There they can install either (1) simple lap belts or (2) lap-and-shoulder belts. 54 Fed. Reg. 46257-46258 (1989); 49 CFR § 571.208 (1993), promulgated pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (Act), 80 Stat. 718, 15 U. S. C. § 1381 et seq. (1988 ed.) (recodified without substantive change at 49 U. S. C. § 30101 et seq. (2006 ed.)).
The question presented here is whether this federal regulation pre-empts a state tort suit that, if successful, would deny manufacturers a choice of belts for rear inner seats by imposing tort liability upon those who choose to install a simple lap belt. We conclude that providing manufacturers with this seatbelt choice is not a significant objective of the federal regulation. Consequently, the regulation does not pre-empt the state tort suit.
I
In 2002, the Williamson family, riding in their 1993 Mazda minivan, was struck head on by another vehicle. Thanh Williamson was sitting in a rear aisle seat, wearing a lap belt; she died in the accident. Delbert and Alexa Williamson were wearing lap-and-shoulder belts; they survived. They, along with Thanh’s estate, subsequently brought this Cali *327 fornia tort suit against Mazda. They claimed that Mazda should have installed lap-and-shoulder belts on rear aisle seats, and that Thanh died because Mazda equipped her seat with a lap belt instead.
The California trial court dismissed this tort claim on the basis of the pleadings. And the California Court of Appeal affirmed. The appeals court noted that in Geier v. American Honda Motor Co., 529 U. S. 861 (2000), this Court considered whether a different portion of (an older version of) Federal Motor Vehicle Safety Standard 208 (FMVSS 208) — a portion that required installation of passive restraint devices — pre-empted a state tort suit that sought to hold an auto manufacturer liable for failure to install a particular kind of passive restraint, namely, airbags. We found that the federal regulation intended to assure manufacturers that they would retain a choice of installing any of several different passive restraint devices. And the regulation sought to assure them that they would not have to exercise this choice in favor of airbags. For that reason we thought that the federal regulation pre-empted a state tort suit that, by premising tort liability on a failure to install airbags, would have deprived the manufacturers of the choice that the federal regulation had assured them. Id., at 874-875.
The court saw considerable similarity between this case and Geier. The federal regulation at issue here gives manufacturers a choice among two different kinds of seatbelts for rear inner seats. And a state lawsuit that premises tort liability on a failure to install a particular kind of seatbelt, namely, lap-and-shoulder belts, would in effect deprive the manufacturer of that choice. The court concluded that, as in Geier, the federal regulation pre-empts the state tort suit. 167 Cal. App. 4th 905, 84 Cal. Rptr. 3d 545 (2008).
The Williamsons sought certiorari. And we granted cer-tiorari in light of the fact that several courts have interpreted Geier as indicating that FMVSS 208 pre-empts state tort suits claiming that manufacturers should have installed *328 lap-and-shoulder belts, not lap belts, on rear inner seats. Carden v. General Motors Corp., 509 F. 3d 227 (CA5 2007); Roland v. General Motors Corp., 881 N. E. 2d 722 (Ind. App. 2008); Heinricher v. Volvo Car Corp., 61 Mass. App. 313, 809 N. E. 2d 1094 (2004).
II
In Geier, we considered a portion of an earlier (1984) version of FMVSS 208. That regulation required manufacturers to equip their vehicles with passive restraint systems, thereby providing occupants with automatic accident protection. 49 Fed. Reg. 28983 (1984). But that regulation also gave manufacturers a choice among several different passive restraint systems, including airbags and automatic seatbelts. Id., at 28996. The question before the Court was whether the Act, together with the regulation, pre-empted a state tort suit that would have held a manufacturer liable for not installing airbags. 529 U. S., at 865. By requiring manufacturers to install airbags (in order to avoid tort liability) the tort suit would have deprived the manufacturers of the choice among passive restraint systems that the federal regulation gave them. See Hillsborough County v. Automated Medical Laboratories, Inc., 471 U. S. 707, 713 (1985) (“[SJtate laws can be pre-empted by federal regulations as well as by federal statutes").
We divided this basic pre-emption question into three subsidiary questions. 529 U. S., at 867. First, we asked whether the statute’s express pre-emption provision preempted the state tort suit. That statutory clause says that “no State” may “establish, or . . . continue in effect. .. any safety standard applicable to the same aspect of performance” of a motor vehicle or item of equipment “which is not identical to the Federal standard.” 15 U. S. C. § 1392(d) (1988 ed.) (emphasis added). We had previously held that a word somewhat similar to “standard,” namely, “requirements” (found in a similar statute), included within its scope state “common-law duties,” such as duties created by state *329 tort law. Medtronic, Inc. v. Lohr, 518 U. S. 470, 502-503 (1996) (plurality opinion); id., at 503-505 (Breyer, J., concurring in part and concurring in judgment); id., at 509-512 (O’Connor, J., concurring in part and dissenting in part). But we'nonetheless held that the state tort suit in question fell outside the scope of this particular pre-emption clause. That is primarily because the statute also contains a saving clause, which says that “[cjompliance with” a federal safety standard “does not exempt any person from any liability under common law.” 15 U. S. C. §1397(k) (emphasis added). Since tort law is ordinarily “common law,” we held that “the presence of the saving clause” makes clear that Congress intended state tort suits to fall outside the scope of the express pre-emption clause. Geier, 529 U. S., at 868.
Second, we asked the converse question: The saving clause at least removes tort actions from the scope of the express pre-emption clause. Id., at 869. But does it do more? Does it foreclose or limit “the operation of ordinary preemption principles insofar as those principles instruct us to read” federal statutes as pre-empting state laws (including state common-law standards) that “actually conflict” with the federal statutes (or related regulations)? Ibid. (internal quotation marks omitted). We concluded that the saving clause does not foreclose or limit the operation of “ordinary pre-emption principles, grounded in longstanding precedent.” Id., at 874.
These two holdings apply directly to the case before us. We here consider (1) the same statute, 15 U. S. C. § 1381 et seq.; (2) a later version of the same regulation, FMVSS 208; and (3) a somewhat similar claim that a state tort action conflicts with the federal regulation. In light of Geier, the statute’s express pre-emption clause cannot pre-empt the common-law tort action; but neither can the statute’s saving clause foreclose or limit the operation of ordinary conflict pre-emption principles. We consequently turn our attention *330 to Geier’s third subsidiary question, whether, in fact, the state tort action conflicts with the federal regulation.
Ill
Under ordinary conflict pre-emption principles a state law that “stands as an obstacle to the accomplishment and execution of the full purposes and objectives” of a federal law is pre-empted. Hines v. Davidowitz, 312 U. S. 52, 67 (1941). See ibid. (federal statute can pre-empt a state statute); Cipollone v. Liggett Group, Inc., 505 U. S. 504 (1992) (federal statute can pre-empt a state tort suit); Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta, 458 U. S. 141 (1982) (federal regulation can pre-empt a state statute); Geier, supra (federal regulation can pre-empt a state tort suit). In Geier, we found that the state law stood as an “ ‘obstacle’ to the accomplishment” of a significant federal regulatory objective, namely, the maintenance of manufacturer choice. 529 U. S., at 886. We must decide whether the same is true here.
A
At the heart of Geier lies our determination that giving auto manufacturers a choice among different kinds of passive restraint devices was a significant objective of the federal regulation. We reached this conclusion on the basis of our examination of the regulation, including its history, the promulgating agency’s contemporaneous explanation of its objectives, and the agency’s current views of the regulation’s pre-emptive effect.
The history showed that the Department of Transportation (DOT) had long thought it important to leave manufacturers with a choice. In 1967, DOT required manufacturers to install manual seat belts. Id., at 875; 32 Fed. Reg. 2408, 2415 (1967). Because many car occupants did not “buckle up,” DOT began to require passive protection, such as airbags or automatic seatbelts, but without “favor[ing]” or “expecting]” the use of airbags. Geier, supra, at 875 (internal *331 quotation marks omitted); 35 Fed. Reg. 16927 (1970). DOT subsequently approved the use of ignition interlocks, which froze the ignition until the occupant buckled the belt, as a substitute for passive restraints. Geier, supra, at 876; 37 Fed. Reg. 3911 (1972). But the interlock devices were unpopular with the public, and Congress soon forbade the agency to make them a means of compliance. Geier, supra, at 876; Motor Vehicle and Schoolbus Safety Amendments of 1974, § 109, 88 Stat. 1482 (previously codified at 15 U. S. C. § 1410b (1988 ed.)). DOT then temporarily switched to the use of demonstration projects, but later it returned to mandating passive restraints, again leaving manufacturers with a choice of systems. Geier, supra, at 876-877; see 49 Fed. Reg. 28962.
DOT’s contemporaneous explanation of its 1984 regulation made clear that manufacturer choice was an important means for achieving its basic objectives. The 1984 regulation gradually phased in passive restraint requirements, initially requiring manufacturers to equip only 10% of their new fleets with passive restraints. DOT explained that it intended its phasing period partly to give manufacturers time to improve airbag technology and to develop “other, better” passive restraint systems. Geier, 529 U. S., at 879. DOT further explained that it had rejected an '“all airbag’” system. Ibid. It was worried that requiring airbags in most or all vehicles would cause a public backlash, like the backlash against interlock devices. Ibid. DOT also had concerns about the safety of airbags, for they could injure out-of-place occupants, particularly children. Id., at 877-878. And, given the cost of airbags, vehicle owners might not replace them when necessary, leaving occupants without passive protection. Ibid. The regulation therefore “deliberately sought variety — a mix of several different passive restraint systems.” Id., at 878. DOT hoped that this mix would lead to better information about the devices’ comparative effectiveness and to the eventual development of “alter *332 native, cheaper, and safer passive restraint systems.” Id., at 879.
Finally, the Solicitor General told us that a tort suit that insisted upon use of airbags, as opposed to other federally permissible passive restraint systems, would “stan[d] as an obstacle to the accomplishment and execution of these objectives.” Id., at 883 (quoting Brief for United States as Amicus Curiae in Geier v. American Honda Motor Co., O. T. 1999, No. 98-1811, pp. 25-26 (hereinafter United States Brief in Geier); internal quotation marks omitted). And we gave weight to the Solicitor General’s view in light of the fact that it “ ‘embodie[d] the Secretary’s policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car.’ ” 529 U. S., at 881 (quoting United States Brief in Geier 25-26).
Taken together, this history, the agency’s contemporaneous explanation, and the Government’s current understanding of the regulation convinced us that manufacturer choice was an important regulatory objective. And since the tort suit stood as an obstacle to the accomplishment of that objective, we found the tort suit pre-empted.
B
We turn now to the present case. Like the regulation in Geier, the regulation here leaves the manufacturer with a choice. And, like the tort suit in Geier, the tort suit here would restrict that choice. But unlike Geier, we do not believe here that choice is a significant regulatory objective.
We concede that the history of the regulation before us resembles the history of airbags to some degree. In 1984, DOT rejected a regulation that would have required the use of lap-and-shoulder belts in rear seats. 49 Fed. Reg. 15241. Nonetheless, by 1989 when DOT promulgated the present regulation, it had “concluded that several factors had changed.” 54 Fed. Reg. 46258.
*333 DOT then required manufacturers to install a particular kind of belt, namely, lap-and-shoulder belts, for rear outer seats. In respect to rear inner seats, it retained manufacturer choice as to which kind of belt to install. But its 1989 reasons for retaining that choice differed considerably from its 1984 reasons for permitting manufacturers a choice in respect to airbags. DOT here was not concerned about consumer acceptance; it was convinced that lap-and-shoulder belts would increase safety; it did not fear additional safety risks arising from use of those belts; it had no interest in ensuring a mix of devices; and, though it was concerned about additional costs, that concern was diminishing.
In respect to consumer acceptance, DOT wrote that if
“people who are familiar with and in the habit of wearing lap/shoulder belts in the front seat find lap/shoulder belts in the rear seat, it stands to reason that they would be more likely to wear those belts when riding in the rear seat.” 53 Fed. Reg. 47983 (1988).
In respect to safety, DOT wrote that, because an increasing number of rear seat passengers wore seatbelts, rear seat lap-and-shoulder belts would have “progressively greater actual safety benefits.” 54 Fed. Reg. 46257.
It added:
“[S]tudies of occupant protection from 1968 forward show that the lap-only safety belts installed in rear seating positions are effective in reducing the risk of death and injury. . . . However, the agency believes that rear-seat lap/shoulder safety belts would be even more effective.” Ibid.
Five years earlier, DOT had expressed concern that lap- and-shoulder belts might negatively impact child safety by interfering with the use of certain child car seats that relied upon a tether. But by 1989, DOT found that car-seat designs “had shifted away” from tethers. 53 Fed. Reg. 47983. And rear lap-and-shoulder belts could therefore offer safety *334 benefits for children old enough to use them without diminishing the safety of smaller children in car seats. Id., at 47988-47989 (“[T]he agency believes that this proposal for rear seat lap/shoulder belts would offer benefits for children riding in some types of booster seats, would have no positive or negative effects on children riding in most designs of car seats and children that are too small to use shoulder belts, and would offer older children the same incremental safety protection [as adults]”). Nor did DOT seek to use its regulation to spur the development of alternative kinds of rear aisle or middle seat safety devices. See 54 Fed. Reg. 46257.
Why then did DOT not require lap-and-shoulder belts in these seats? We have found some indication that it thought use of lap-and-shoulder belts in rear aisle seats could cause “entry and exit problems for occupants of seating positions to the rear” by “stretching] the shoulder belt across the aisleway,” id., at 46258. However, DOT encouraged manufacturers to address this issue through innovation:
“[I]n those cases where manufacturers are able to design and install lap/shoulder belts at seating positions adjacent to aisleways without interfering with the aisle-way’s purpose of allowing access to more rearward seating positions[, the agency] encourages the manufacturers to do so.” Ibid.
And there is little indication that DOT considered this matter a significant safety concern. Cf. Letter from Philip R. Recht, Chief Counsel, National Highway Traffic Safety Admin., to Roger Matoba (Dec. 28, 1994), App. to Reply Brief for Petitioners 2 (“With respect to your concerns about the safety of shoulder safety belts which cross an aisle, I note that such belts do not in fact prevent rearward passengers from exiting the vehicle. Such passengers may . . . g[o] under or over the belt. They may also move the belt aside”).
*335 The more important reason why DOT did not require lap- and-shoulder belts for rear inner seats was that it thought that this requirement would not be cost effective. The agency explained that it would be significantly more expensive for-manufacturers to install lap-and-shoulder belts in rear middle and aisle seats than in seats next to the car doors. 54 Fed. Reg. 46258. But that fact — the fact that DOT made a negative judgment about cost-effectiveness— cannot by itself show that DOT sought to forbid common-law tort suits in which a judge or jury might reach a different conclusion.
For one thing, DOT did not believe that costs would remain frozen. Rather it pointed out that costs were falling as manufacturers were “voluntarily equipping more and more of their vehicles with rear seat lap/shoulder belts.” Ibid. For another thing, many, perhaps most, federal safety regulations embody some kind of cost-effectiveness judgment. While an agency could base a decision to pre-empt on its cost-effectiveness judgment, we are satisfied that the rulemaking record at issue here discloses no such preemptive intent. And to infer from the mere existence of such a cost-effectiveness judgment that the federal agency intends to bar States from imposing stricter standards would treat all such federal standards as if they were maximum standards, eliminating the possibility that the federal agency seeks only to set forth a minimum standard potentially supplemented through state tort law. We cannot reconcile this consequence with a statutory saving clause that foresees the likelihood of a continued meaningful role for state tort law. Supra, at 328-329.
Finally, the Solicitor General tells us that DOT’S regulation does not pre-empt this tort suit. As in Geier, “the agency’s own views should make a difference.” 529 U. S., at 883.
“Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the rele *336 vant history and background are complex and extensive. The agency is likely to have a thorough understanding of its own regulation and its objectives and is ‘uniquely qualified’ to comprehend the likely impact of state requirements.” Ibid.
There is “no reason to suspect that the Solicitor General’s representation of DOT’S views reflects anything other than ‘the agency’s fair and considered judgment on the matter.’” Id., at 884 (quoting Auer v. Robbins, 519 U. S. 452, 462 (1997)).
Neither has DOT expressed inconsistent views on this subject. In Geier, the Solicitor General pointed out that “state tort law does not conflict with a federal ‘minimum standard’ merely because state law imposes a more stringent requirement.” United States Brief in Geier 21 (citation omitted). And the Solicitor General explained that a standard giving manufacturers “multiple options for the design of” a device would not pre-empt a suit claiming that a manufacturer should have chosen one particular option, where “the Secretary did not determine that the availability of options was necessary to promote safety.” Id., at 22; see Brief for United States as Amicus Curiae in Wood v. General Motors Corp., O. T. 1989, No. 89-46, p. 15. This last statement describes the present case.
In Geier, then, the regulation’s history, the agency’s contemporaneous explanation, and its consistently held interpretive views indicated that the regulation sought to maintain manufacturer choice in order to further significant regulatory objectives. Here, these same considerations indicate the contrary. We consequently conclude that, even though the state tort suit may restrict the manufacturer’s choice, it does not “stan[d] as an obstacle to the accomplishment . . . of the full purposes and objectives” of federal law. Hines, 312 U. S., at 67. Thus, the regulation does not pre-empt this tort action.
*337 The judgment of the California Court of Appeal is reversed.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.